**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SEAMUS KERLEY,

               Plaintiff,

   – against –

UNIVERSAL PROTECTION SERVICE, LLC

          Defendants.

**Case No. 23 Civ. 1906**

**COMPLAINT**

     Plaintiff Seamus Kerley hereby brings claims against Defendant Universal Protection Service, LLC, which does business as "Allied Universal," by alleging and averring as follows:

**NATURE OF THE CASE**

     1.    Plaintiff Seamus Kerley is a dedicated and hardworking former Administrator and Operator employed by Defendant Universal Protection Service, LLC ("Allied Universal" or the "Company"), whose rights under the Family Medical Leave Act ("FMLA") and other anti-discrimination laws were flagrantly violated merely for exercising his right to take legallt protected paternity leave following the birth of his daughter.

     2.    As described below, Allied Universal engaged in an unlawful campaign to punish and push out Mr. Kerley merely for taking a three month leave to bond with his newborn daughter and assist his partner in her post-partum recovery.

     3.    Rather than ensure that Mr. Kerley was not penalized for exercising his FMLA rights and was able to return to his same or equivalent role after his FMLA leave ended, Allied Universal did everything in its power to try to get Mr. Kerley to quit.

     4.    Ultimately, after Mr. Kerley refused to voluntarily discontinue his employment and engaged in protected activity by objecting to the discrimination and other unlawful conduct

Allied Universal was perpetrating against him, the Company unlawfully terminated his

employment once and for all.

5.      At a time when Mr. Kerley should be celebrating the birth of his first child, he has

been left shattered and devastated, and his family is left to face financial turmoil.

6.      Indeed, after his return from FMLA leave, Allied Universal immediately demoted

Mr. Kerley to a role with fewer responsibilities and much lower status that the role he held

before going on leave.  To add insult to injury, Allied Universal gave Mr. Kerley's prior role to a

less experienced employee who had not taken FMLA leave in connection with the birth of a

child, nor who had any young children at home or for whom he provided care.

7.      Allied Universal further retaliated against Mr. Kerley for exercising his FMLA

rights by unilaterally and arbitrarily modifying his work schedule.  Specifically, before he went

on paternity leave, Mr. Kerley was assigned to the 10:00am to 6:00pm tour, Monday through

Friday, but when he returned to work, his schedule was suddenly modified to the 2:00pm to

10:00pm tour, Tuesdays through Saturday.  This unilateral change was extremely problematic to

Mr. Kerley and his family, who had put great effort into arranging a childcare plan for their

newborn daughter that assumed Allied Universal would not suddenly and arbitrarily reassign him

to work a different tour and on different days.

8.      Moreover, rather than try to work with Mr. Kerley to come up with a solution that

aligned with Defendant's purported business needs, restored Mr. Kerley to the same or an

equivalent position, and minimized the disruption and stress caused to Mr. Kerley and his family,

Allied Universal "offered" him new roles that were simply meant to reinforce that he *persona*

*non grata* at the Company for taking so much time off pursuant to the FMLA.

9.      In fact, Allied Universal "offered" Mr. Kerley one new role (for which he still had to interview) that would have resulted in a significant pay cut and required him to travel into Manhattan every day from his home in Long Island (he had, in contrast, been working in Long Island and/or Jamaica, Queens before going on FMLA leave).

10.     Allied Universal "offered" another role to Mr. Kerley based in Long Island City, Queens that had no definite start date, which meant, in other words, the role did not actually exist, and may never exist.

11.     Ultimately, Mr. Kerley had no choice but to agree to Allied Universal's other "offer," which was to work as an "Operator" — a generic, non-specialized position inferior in status and responsibilities to the specialized "Administrator" role he had held for years — for the 2:00pm to 10:00pm tour, Tuesday to Saturday.  Even in this downgraded Operator role, however, Allied Universal made every effort to force Mr. Kerley to resign, including by failing to give him any instruction or direction about his duties and responsibilities, and by failing to even provide him with a consistent workspace.

12.     In addition, Allied Universal unlawfully and inexplicably discontinued Mr. Kerley's health benefits without notice at some point during his FMLA leave – a plainly prohibited action under the FMLA – which left him without health insurance coverage for months and caused him to have to incur significant out-of-pocket medical costs.

13.     Mr. Kerley repeatedly asked Allied Universal's Human Resources ("HR") Department to correct this error and reinstate his benefits, but the Company disgracefully ignored his concerns completely.

14.     Then, after Mr. Kerley engaged counsel and asserted that his rights were being violated and indicated his intent to bring suit, Allied Universal removed him from his role entirely.

15.     Over the course of the next several weeks, while the Company refused to keep paying Mr. Kerley his salary, Allied Universal led Mr. Kerley on, pretending to earnestly look for another role for him within the Company.  Ultimately, despite repeated inquiries and requests for updates, Mr. Kerley heard nothing but radio silence back from Allied Universal. Disturbingly, Allied Universal did not even have the decency to notify Mr. Kerley in any way that it was no longer planning to move him to any new role at all, resulting in the termination of his employment.

16.     No employee should have to choose between bonding with their newborn child and caring for their partner postpartum, and their job and livelihood.

17.     Allied Universal's brazen conduct is textbook retaliation.  Mr. Kerley exercised his right to take FMLA leave never fearing that he would be so harshly penalized by his employer for doing so.  Allied Universal was obligated by law not to retaliate against Mr. Kerley for exercising his FMLA rights.  But that is exactly what has happened, as he was first demoted and forced to accept a completely different work schedule that posed significant hardships on him and his family, before ultimately being brazenly terminated after courageously engaging in protected activity by complaining that his rights were being trampled upon.

18.     Simply, had Mr. Kerley not taken FMLA leave, he would have remained in the same or an equivalent role and still working the same or similar tour he had before going on protected leave.

19.     This is insidious, unlawful conduct by a large employer that should (and likely does) know better, and will no doubt deter a reasonable person from exercising their protected rights under the FMLA.

20.     Allied Universal's treatment of Mr. Kerley is unacceptable, and the very kind of unlawful conduct that the FMLA and anti-discrimination laws were enacted to prevent.

21.     As such, Mr. Kerley is left with no choice but to seek redress for Defendant's disgusting violation of his rights by bringing this action against Allied Universal for retaliating against him for exercising and interfering with his right to take paternity leave pursuant to the Family Medical Leave Act, 29 U.S.C. §§2601 *et seq.* ("FMLA"), discriminating against him because of his familial status, *i.e.*, for being an active father to his newborn child, in violation of the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"), and discriminating against him for being a caretaker for her newborn child, in violation of the NYCHRL.

<u>**JURISDICTION AND VENUE**</u>

22.     Jurisdiction of this Court is proper under 29 U.S.C. §§ 2617 and 28 U.S.C. §§ 1331 as Plaintiff alleges claims pursuant to the FMLA.

23.     The Court has supplemental jurisdiction over Plaintiff's claims under state and local law pursuant to 28 U.S.C. § 1367(a).

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as Defendant resides within the Eastern District of New York, and a substantial portion of the acts complained of here occurred within this district.

## PARTIES

25.     Plaintiff Seamus Kerley is an adult resident of the City of New York.  At all relevant times, Mr. Kerley qualified as an "employee" of Allied Universal under all relevant statutes.

26.     Defendant Allied Universal is a Delaware limited liability corporation authorized to do business in the state of New York.  Allied Universal provides a broad array of security services, systems, and solutions, and specifically provides security-related services for the Metropolitan Transportation Authority ("MTA") and its Long Island Railroad ("LIRR") train service.  At all relevant times, Allied Universal controlled the terms and conditions of Plaintiff's employment, thus qualifying as his "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.     Mr. Kerley's Successful Tenure as an Administrator at Allied Universal**

27.     Mr. Kerley first joined Allied Universal in 2015 as an Administrator.  The Administrator role is a specialized office role (there are only two Administrators who worked for Allied Universal in connection with the services it provided to the LIRR) and is responsible for, *inter alia*, monitoring and responding to requests for data and information, such as requests to see video surveillance from a particular LIRR train station.

28.     Mr. Kerley was hired by former Allied Universal Administrator Supervisor Bill Bambrick, who prepared Mr. Kerley to take over his role once he retired — which he did in February 2022 – the same month Mr. Kerley began his FMLA leave.

29.     Throughout his tenure, Mr. Kerley was a strong, well-liked, and consistent performer.

30.     For much of his tenure, Mr. Kerley was scheduled to work the day tour, Monday to Friday, from the Gibson LIRR train station and satellite office.

## II.     Mr. Kerley Takes FMLA Leave in Connection with the Birth of His Daughter, Returns to Work to Find that Another Employee Has Taken Over His Job, and Complains to Allied Universal's HR and Managers to No Avail

31.     Following the birth of Mr. Kerley's first child, a daughter, in February 2022, Mr. Kerley took approved FMLA leave and spent the next three months at home with his daughter forming a father-daughter bond and helping his partner recover from giving birth.

32.     Mr. Kerley stayed in regular communication with his managers throughout his leave, even contacting Tom Kavanaugh, Assistant Office Manager, a couple weeks before his anticipated return date to let him know that he was ready to get back to work.

33.     Mr. Kerley also spoke with Sandra Johnson, an Allied official, about his return to work.

34.     However, on the morning of May 16, 2022, the day Mr. Kerley was scheduled to return to work, Ms. Johnson suddenly called to tell him that she had allegedly spoken to Mr. Kerley's manager, Ronnie Weisbrod, Office Manager, and James Boyle, LIRR Senior Director of Security Operations, who claimed that Mr. Kerley's old position had reportedly been filled by someone else while he was on leave.

35.     Mr. Kerley was then offered the choice to pick between three wholly inadequate new roles.  The first position was based in Long Island City (very far from the Valley Stream-based Gibson office where Mr. Kerley had been working from) and had no definite start date — or in other words, may never have become an actual position for Mr. Kerley to take on.

36.     The second position was based in Manhattan (meaning Mr. Kerley would have to commute from Long Island into Manhattan), was at a much lower salary than what Mr. Kerley

had been making as an Administrator, had fewer responsibilities and thus was essentially a demotion, and was not guaranteed since Mr. Kerley would still have to interview for the role.

37.     The third option presented to Mr. Kerley was a Tuesday to Saturday evening tour as an Operator, a far less specialized position than Administrator with different duties and responsibilities and a much lower status.

38.     Mr. Kerley immediately contacted Allied Universal Human Resources ("HR") Manager Caroline Agramante to complain that his FMLA rights were being violated because he was being denied his old position (or an equivalent position) and was being harassed upon his return to work.

39.     Ms. Agramante pledged that she would investigate the complaint and get back to Mr. Kerley but never followed up with him.

40.     Mr. Kerley soon learned that a colleague who had only previously worked as an Operator was picked to take over his duties and responsibilities as an Administrator and work out of the Gibson office.

41.     In fact, it appeared that the same day that Mr. Kerley returned to work was that colleague's first day in Mr. Kerley's old role, evidence by the colleague asking Mr. Kerley for help and advice on how to perform the functions of that job.

42.     Then on May 18, 2022, Mr. Kerley complained to Mr. Weisbrod that he had unlawfully been stripped of his old role and tour merely because he took three months of FMLA leave after the birth of his daughter.

43.     Notably, upon information and belief, another male employee had recently had a newborn baby also but took only a few weeks of paternity leave (as opposed to the three months

Mr. Kerley had lawfully taken), and shortly upon that employee's return to work, he received a promotion.

44.     In contrast, of course, Mr. Kerley was abruptly demoted and given no option but to work an entirely different schedule once he returned to work following his three-month paternity leave.

45.     In response, Mr. Weisbrod told Mr. Kerley that "Bob [Murphy, LIRR Chief of Security Operations] isn't approving two admin guys," or, in other words, Allied Universal and the LIRR, in tandem, had decided that Mr. Kerley would not be returning to his old Administrator role.

46.     Over the next few weeks, there was chatter in the workplace about Mr. Kerley taking on both an Operator and Administrator role but with no increase to his salary.

47.     Mr. Kerley felt slighted by this insulting proposal, but when he met again with Mr. Weisbrod in late-May/early-June 2022, Mr. Weisbrod advised him that Mr. Boyle had said that "if [Mr. Kerley] doesn't do both the admin job and operator job, he will be fired," *i.e.*, Mr. Kerley did not have a choice in the matter.

48.     While ultimately no such dual Operator/Administrator role was formally offered to Mr. Kerley, the animus against Mr. Kerley from employees of both Allied Universal and the LIRR was palpable and clear.

**III.    Mr. Kerley is Told Shifting, Inconsistent, and False Reasons Why He Could Not Return to His Old Role, Strongly Suggesting Pretext**

49.     Allied Universal, in tandem with the LIRR, have offered varying, inconsistent, and blatantly false reasons for why Mr. Kerley was not allowed to return to the role and tour he had prior to going on FMLA leave upon his return to work, strongly suggesting that the excuses are all lies and pretext for unlawful animus.

50.     Mr. Kerley was first told by Allied Universal officials that someone else had filled his role.

51.     However, Allied Universal quickly backtracked — likely after realizing how blatantly retaliatory and unlawful it would for an employer to *admit* that they had decided to permanently fill the role of someone who was out on temporary FMLA leave — and claimed instead that the role itself had been abolished.

52.     This excuse was demonstrably false as the role had in fact been given to Mr. Kerley's colleague.

53.     Then, when Mr. Kerley offered to work as an Administrator during the 2:00pm to 10:00pm tour, Monday to Friday, Allied Universal claimed that he could not be put on that tour supposedly because no employee was allowed to work that tour from a satellite LIRR office.

54.     However, Mr. Kerley quickly noted how several employees did in fact work from the Gibson satellite LIRR office during that specific afternoon tour.  Allied Universal responded by claiming that these individuals apparently had "special exemptions."

55.     Mr. Kerley was then told that Allied Universal and the LIRR did not want to give him back his old Administrator role because they were able to adequately reassign Mr. Kerley's responsibilities to other employees while he was out on FMLA leave, and thus did not want to pay someone to fill that role now exclusively.

56.     However, regardless of whether this excuse was true or not, Allied Universal was unquestionably obligated under the FMLA to return Mr. Kerley to a nearly identical and equivalent job – not demote him.

57.     Mr. Kerley was then given the excuse that he could not return to his old role because he would allegedly not receive enough managerial supervision at the Gibson office, and

so he had to work from the Jamaica LIRR office. However, this excuse was tenuous at best as Mr. Kerley had already worked for several years at the Gibson office with minimal supervision from Mr. Bambrick.

58.    Moreover, there were in fact several employees that worked alone and without direct supervision at other satellite locations.

59.    As such, not only has Allied Universal failed woefully to keep its story straight as to why Mr. Kerley was not allowed to return to his old role and tour following his FMLA leave, but Allied Universal through Mr. Weisbrod, and the LIRR through Mr. Boyle, blamed one another for not knowing about/being prepared for Mr. Kerley's return to work, after evidently assuming falsely that he had quit for good when he went on leave.

60.    To pour more salt into his wounds, Mr. Weisbrod and Mr. Boyle told Mr. Kerley that he "absolutely must work Saturdays" in his new Operator role. This was particularly devastating because Mr. Kerley and his partner had arranged childcare for their infant daughter under the belief that Mr. Kerley would *not* have to work on Saturdays, which was the case before he went on FMLA leave.

61.    Allied Universal also inexplicably discontinued Mr. Kerley's health benefits almost immediately after he went on FMLA leave and improperly docked him 40 hours of vacation time.

62.    Mr. Kerley repeatedly brought these additional examples of retaliatory acts to HR's attention and requested that his benefits be reinstated and that he be reimbursed for his out-of-pocket medical expenses resulting from the unlawful and premature revocation of his benefits.

63.     However, in alignment with Allied Universal's revolting theme of doing all it could to push Mr. Kerley out of the Company, HR completely ignored Mr. Kerley despite his repeated requests for updates on his complaints.

64.     In sum, after Mr. Kerley returned from FMLA leave, Allied Universal, often in tandem with the LIRR, did everything in its power to make Mr. Kerley feel no longer wanted at the Company, completely stunted his career development and chances of progressing at the Company, and tried dearly to force him to leave on his own.

65.     Notably, on most days following his return from FMLA leave, Mr. Kerley was lucky if he even had his own workspace and/or access to a computer to do his work.

66.     Further, Allied Universal did not even bother to provide him with any training, direction, or guidance on how to successfully perform the duties and responsibilities in his new Operator role, leaving Mr. Kerley in the dark about what he was supposed to do and whether what he was doing was correct.  To put it differently, Allied Universal was blatantly setting Mr. Kerley up for failure.

67.     In fact, several managers candidly told Mr. Kerley that he was being targeted by upper management for choosing to take three months off for paternity leave.

## IV.    After Plaintiff Engages in Protected Activity and Accuses Allied Universal of Violating the FMLA, NYSHRL, and NYCHRL Allied Universal Retaliates Against Him by Terminating His Employment

68.     On August 22, 2022, Mr. Kerley, through his counsel, wrote to Allied Universal (as well as the LIRR) to notify them that his rights under the FMLA, NYSHRL, and NYCHRL had been violated based on how he been treated since returning from paternity leave, and that he intended to file his claims in court.

69.     Despite the serious nature of the accusations of unlawful conduct lodged by Mr.

Kerley, Allied Universal failed to meaningfully respond to the August 22, 2022.

70.     Instead, realizing that it had in fact violated Mr. Kerley's rights and thus needed

to now minimize its legal exposure and liability, on or about September 22, 2022, Allied

Universal "offered" Mr. Kerley his prior role as an Administrator back, albeit at a different

location (the Jamaica, Queens LIRR station) and tour than he had before going on FMLA leave.

71.     Nonetheless, Allied Universal continued to fail to place Mr. Kerley back on the

Company's health insurance plan, nor reimburse him for the out-of-pocket medical expenses he

had to incur because of not having Company-sponsored health insurance.

72.     It would later become abundantly clear, however, that Allied Universal's "offer"

to Mr. Kerley to return to his Administrator role was wholly disingenuous and a ploy, as the

Company had no actual intention of keeping Mr. Kerley around for much longer and was merely

buying time before further acting against Mr. Kerley to minimize the appearance of an unlawful

retaliatory motive.

73.     Eventually, on the evening of January 6, 2023, Mr. Kerley received a call from

Ms. Johnson and Don Evans, Operations Manager, informing him that he was no longer allowed

to work for the LIRR, and needed to report to Allied Universal's downtown Manhattan office to

discuss other possibilities for employment within the Company.

74.     No explanation was offered for why Mr. Kerley could no longer work for the

LIRR, nor why he was the only Allied Universal employee who had been assigned to work with

the LIRR to suddenly be removed from their role.

75.     Mr. Kerley reported to Allied Universal's downtown Manhattan offices and met

with John Mcardle, District Manager, on January 9, 2023.  Mr. Mcardle informed Mr. Kerley

that there were no comparable jobs available for him at Allied Universal.  Mr. Kerley reiterated that he was ready and willing to take on another role, and that his family was desperately relying on his income to support their household.

76.    Mr. Kerley was told that he would not be receiving his pay while Allied Universal allegedly looked for another role for him, but that he could use his unused paid time off ("PTO") if he wished to be paid during this time.

77.    The next day, January 10, 2023, Mr. Mcardle notified Mr. Kerley about a position working with Goldman Sachs, which would require him to have to travel all the way to downtown Manhattan and work on weekends.

78.    Nevertheless, on January 13, 2023, Mr. Kerley interviewed for the role with Goldman Sachs.  By this point, Mr. Kerley had neither worked nor been paid for four days and was forced to exhaust his remaining PTO.

79.    Around this time, on January 11, 2023, Allied Universal, through its counsel, finally responded in substance to Mr. Kerley's August 22, 2022, letter from his counsel.  Allied Universal expectedly denied Mr. Kerley's claims and attempted to shift the blame for why Mr. Kerley was not able to return to his old role following his paternity leave onto the LIRR, whom the Company vaguely claimed "eliminated" Mr. Kerley's position for "operational reasons" – yet another shifting and inconsistent proffered excuse.

80.    Allied Universal also falsely blamed Mr. Kerley for not supposedly contacting the correct HR manager about being unlawfully taken off the Company's health insurance plan.

81.    Following his interviews with Goldman Sachs, Allied Universal inexplicably failed to follow up *at all* with Mr. Kerley.  Mr. Kerley reached out in writing to the Company to

no avail on January 17, January 19, and January 23, 2023, and received only complete radio silence back.

82.     Despite not providing him with any documentation, it was clear that Allied Universal had determined once and for all to terminate Mr. Kerley's employment following his engagement in protected activity.

83.     Allied Universal's horrendous retaliatory and discriminatory mistreatment of Mr. Kerley simply for taking protected leave following the birth of his first child, requesting his old role and tour back, and complaining about his rights being trampled upon is appalling.

84.     No father should have to decide between holding onto a job and exercising their right to take FMLA leave following the birth of a child, nor should any worker have to decide between building a bond with their child and helping their partner physically and emotionally recover from childbirth and forfeiting the careers they had painstakingly built.

**FIRST CAUSE OF ACTION**
**UNLAWFUL INTERFERENCE UNDER THE FMLA**

85.     Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

86.     As detailed above, Defendant unlawfully interfered with Plaintiff's rights under the FMLA by refusing to place him back into the same or substantially same position following his return to work from FMLA leave, in addition to denying Mr. Kerley continuing health insurance coverage, and ultimately terminating his employment.

87.     As such, Plaintiff has been damaged and is entitled to the maximum compensation under this law, including liquidated damages and attorney's fees and litigation costs.

## SECOND CAUSE OF ACTION
## UNLAWFUL RETALIATION UNDER THE FMLA

88.    Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

89.    As detailed above, Defendant unlawfully retaliated against Mr. Kerley for exercising his FMLA rights by unlawfully refusing to place him back into the same or substantially same position and denying him continuing health insurance coverage following his return to work from FMLA leave, and by ultimately terminating his employment.

90.    As detailed above, Defendant also unlawfully retaliated against Mr. Kerley for complaining about Defendant's violations of his FMLA rights by terminating his employment shortly after he engaged in such protected activity.

91.    As such, Plaintiff has been damaged and is entitled to the maximum compensation under this law, including liquidated damages and attorney's fees and litigation costs.

## THIRD CAUSE OF ACTION FOR
## DISCRIMINATION UNDER THE NYSHRL

92.    Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

93.    Under the NYSHRL, it is unlawful for an employer to discriminate against an employee because of, *inter alia*, their familial status.

94.    As detailed above, Defendant violated the NYSHRL by discriminating against Plaintiff because of his familial status, *i.e.*, because he was a father/parent and had children and exercised his right to take his full allotment of paternity leave following the birth of his child, by subjecting him to disparate terms and conditions of employment than employees who were not

parents/did not have children, including by failing to place him back into his same or a substantially similar role upon his return from paternity leave, unlawfully removing Mr. Kerley from Defendant's health insurance plan, and ultimately terminating his employment.

95.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

96.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

97.    Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
## RETALIATION UNDER THE NYSHRL

98.    Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

99.    By the actions detailed above, among others, Defendant has unlawfully retaliated against Plaintiff based on his protected activities in violation of the NYSHRL, including by terminating Plaintiff's employment.

100.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

101.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

102.    Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYCHRL

103.    Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

104.    Under the NYCHRL, it is unlawful for an employer to discriminate against an employee because of, *inter alia*, their familial and caregiver status.

105.    As detailed above, Defendant violated the NYCHRL by discriminating against Plaintiff because of his familial and caregiver status, *i.e.*, because he was a father/parent and was a caregiver to his children and exercised his right to take his full allotment of paternity leave following the birth of his child, by subjecting him to disparate terms and conditions of employment than employees who were not parents/did not have children and were not caretakers, including by failing to place him back into his same or a substantially similar role upon his return from paternity leave, unlawfully removing Mr. Kerley from Defendant's health insurance plan, and ultimately terminating his employment.

106.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

107.   As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

108.   Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYCHRL**

109.   Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

110.   By the actions detailed above, among others, Defendant has unlawfully retaliated against Plaintiff based on his protected activities in violation of the NYCHRL, including by terminating Plaintiff's employment.

111.   As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

112.   As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

113.   Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
## FAILURE TO PROVIDE TERMINATION AND CANCELLATION OF BENEFITS NOTICE

114.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

115.    Defendant did not provide Plaintiff with notice of its termination of his employment, nor its cancellation of his benefits, including health insurance, causing him to suffer harm and damages, in violation of NYLL § 191(6).

116.    Due to Defendant's NYLL violations, Plaintiff is entitled to recover from Defendant compensation for damages that resulted therewith, including, but not limited to, his subsequent out-of-pocket health care costs, as well as damages for causing emotional distress, liquidated damages, interest, and attorneys' fees and costs.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A.    Declaring that Defendant engaged in unlawful employment practices prohibited by federal, state, and New York City law;

B.    Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful conduct and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation;

D.    Awarding Plaintiff punitive damages;

E.    Awarding Plaintiff liquidated damages;

F.    Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of the action; and

G.      Awarding Plaintiff such other and further relief as the Court may deem equitable,

just and proper to remedy Defendant's unlawful employment practices.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issue of fact and damages stated herein.

Dated: March 13, 2023                              Respectfully submitted,
       White Plains, New York

**FILIPPATOS PLLC**


By: _____
       Tanvir H. Rahman
199 Main Street, Suite 800
White Plains, New York 10601
T./F: 914.984.1111
trahman@filippatoslaw.com

*Counsel for Plaintiff*